UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| THOMAS C. FOLEY and FOLEY FOR GOVERNOR, INC., <br>      Plaintiffs, <br><br> v. <br><br> STATE ELECTIONS ENFORCEMENT COMMISSION, ALBERT P. LENGE, in his official capacity as executive director and general counsel of the State Elections Enforcement Commission, NANCY WYMAN, in her official capacity as State Comptroller, DENISE L. NAPPIER, in her official capacity as State Treasurer, FEDELE 2010 JOINT GUBERNATORIAL CAMPAIGN COMMITTEE, FEDELE 2010, BOUGHTON FOR CT 2010, and JOHN DOE CORP., <br>      Defendants. | No. 3:10cv1091 (SRU) |

## RULING ON MOTION FOR TEMPORARY RESTRAINING ORDER

The plaintiffs, Thomas C. Foley and Foley for Governor, Inc., move for an order temporarily restraining the State Elections Enforcement Commission ("SEEC"), SEEC Executive Director and General Counsel Alpert P. Lenge, Connecticut Comptroller Nancy Wyman, and Connecticut Treasurer Denise L. Nappier from paying supplemental matching campaign grants to the Fedele 2010 Joint Gubernatorial Campaign Committee, Fedele 2010, and Boughton for CT 2010 under Connecticut's Citizens' Election Program ("CEP").  For the reasons that follow, that motion is denied.

**I.     Background**

Thomas C. Foley and Lieutenant Governor Michael C. Fedele are candidates vying for the 2010 Republican Party nomination for governor; Foley for Governor, Inc. and Fedele 2010

are their respective official campaign committees.  Both Foley and Fedele registered their candidacies in December 2009.  Mark D. Boughton is a Republican candidate for lieutenant governor and his official campaign committee is Boughton for CT 2010.  Boughton and his committee are parties to this lawsuit because, on July 1, 2010, Boughton and Fedele formed the Fedele 2010 Joint Gubernatorial Campaign Committee – a hybrid governor/lieutenant-governor campaign committee established pursuant to Conn. Gen. Stat. § 9-709 – to qualify for CEP funds.

Connecticut provides financing for candidates for state office through the CEP.  Conn. Gen. Stat. § 9-700 *et seq.*; *see generally Green Party of Conn. v. Garfield*, 648 F. Supp. 2d 298, 310-20 (D. Conn. 2009), *aff'd in part and rev'd in part*, No. 09-3760-cv(L), ___ F.3d ___ (2d Cir. July 13, 2010) (describing CEP's enactment, operation, and amendments).  The CEP is administered by the SEEC, for which Lange serves as executive director and general counsel.  In order for money to be distributed from the CEP to participating candidates, payments must be ordered by State Comptroller Wyman, and then disbursed by State Treasurer Nappier.  Conn. Gen. Stat. § 9-706(d).  Lange, Wyman, and Nappier are parties to this suit strictly in their official capacities.

Fedele is participating in the CEP through his joint campaign committee with Boughton, and the SEEC has deemed him to be a qualifying candidate for state campaign financing.[1]  As a

---

[1] To qualify for CEP participation, a gubernatorial candidate must receive $250,000 in qualifying contributions – payments of $100 – of which $225,000 must be contributed by Connecticut residents.  Conn. Gen. Stat. §§ 9-704(a)(1).  The same rule applies to a gubernatorial candidate jointly campaigning with a candidate for lieutenant governor.  *Id.* §§ 9-704(a)(1) & 9-706.  The SEEC determined that Fedele is a qualifying CEP participant on July 8, 2010.  In a separate state court action, Foley attempted to obtain a temporary restraining order preventing Fedele from receiving or spending CEP funds, on the basis that the SEEC had erred in

CEP-participating "majory party" gubernatorial candidate, Fedele is entitled to receive and spend an initial grant of $1.25 million for the primary election; by participating in the CEP, however, he is subject to limits on campaign expenditures to which nonparticipating candidates are not. *Id.* §§ 9-702(c)(B)(ii) & 9-705(a)(1). Foley, by contrast, has opted out of the CEP and is receiving no state funding for his gubernatorial campaign. As a nonparticipant, Foley is obligated to report his campaign expenditure amounts to the SEEC. *Id.* § 9-712. Foley has submitted two reports, the first in April and the second in July, 2010, to the SEEC. *See* Exs. C & D to Def. Fedele 2010 Reply (doc. # 13).

In addition to his initial grant for the Republican primary, Fedele is entitled to receive from the CEP conditional supplemental grants during the course of the primary campaign. In particular, Fedele may receive and spend additional grants that match so-called "excess expenditures" by candidates not participating in the CEP, such as Foley. *Id.* §§ 9-702(c)(B)(iii) & 9-713. An excess expenditure is defined as "an expenditure made, or obligated to be made, by a nonparticipating or a participating candidate who is opposed by one or more other participating candidates in a primary campaign or a general election campaign, which is in excess of the amount of the applicable limit on expenditures for said participating candidates for said campaign." *Id.* § 9-712(b)(1). When a nonparticipating candidate spends more than the CEP expenditure limits for a participating candidate, his CEP-participating opponent is entitled to receive supplemental funds matching the nonparticipating candidate's excess spending. *Id.* § 9-

---

determining Fedele to be a qualifying candidate. That effort proved unsuccessful. *See* Ex. A to Def. Fedele 2010 Reply (doc. # 13) (state superior court ruling denying TRO); Ex. B to Supplemental Mem. in Supp. of Pls.' Ex Parte Mot. for TRO and Prelim. Inj. (doc. # 10) (*Connecticut Mirror* article, published July 14, 2010, describing, in part, Foley's failure in obtaining temporary restraining order in state court).

713. The greatest sum of matching funds that a participating candidate can receive is 100 percent of the initial CEP grant – i.e., an additional $1.25 million during a gubernatorial primary. *Id.* But the amount of matching funds granted to a participating candidate is determined by the size of the nonparticipating candidate's excess expenditures. The matching funds are distributed in quarterly increments, "whenever the nonparticipating candidate receives contributions or makes expenditures exceeding 100%, 125%, 150%, or 175% of the expenditure limit for that particular office." *Green Party*, 648 F. Supp. 2d at 316. Thus, if a nonparticipant spends up to 125 percent of a participating candidate's expenditure limit, the participating candidate will receive matching grants equal to 25 percent of her initial grant. Indeed, as soon as a nonparticipant spends any amount greater than the initial grant, his participating opponent can obtain an additional 25 percent in campaign financing.

The SEEC is responsible for determining whether a nonparticipant has engaged in excess expenditures. Once the SEEC finds that excess expenditures have been made, it must, within two business days, issue a voucher for the matching grant to the participating candidate's campaign. Conn. Gen. Stat. § 9-713. The Connecticut Comptroller must then "draw an order on the State Treasurer for payment, by electronic fund transfer directly into the campaign account of each such participating candidate" within three business of receiving the SEEC voucher. *Id.*

During the primary campaign, Foley has made expenditures in excess of Fedele's expenditure limit. Fedele is therefore entitled to supplemental matching grants. On July 8, 2010, the SEEC approved the initial grant of $1.25 million for Fedele's primary election campaign, as well as a supplemental excess expenditure matching grant of $937,500, an amount equal to 75 percent of Fedele's initial grant. Ex. A to Supplemental Mem. in Supp. of Pls.' Ex Parte Mot. for

TRO and Prelim. Inj. (doc. # 10) at 1.  Because Foley has already raised, and will soon spend, more than 175 percent of Fedele's initial grant of $1.25 million, Fedele will imminently seek the remaining $312,500 excess expenditure matching grant that he can receive under the CEP.  *See* Ex. D to Def. Fedele 2010 Reply (doc. # 13), at 2 (showing that, as of June 30, 2010, Foley has raised more than $2.7 million for his campaign).  Plaintiffs represent that Fedele applied for the final matching grant on July 14, 2010 at a hearing before the SEEC.  In response, the plaintiffs filed this motion that same day to enjoin Fedele from receiving that final matching grant.  The plaintiffs also move to enjoin Fedele from spending any matching grants he has already obtained from the state.

Before turning to the merits of the plaintiffs' motion, I note one procedural matter of significance.  On August 27, 2009, more than ten months before this action was commenced and in what the plaintiffs have asked me to treat as a related case, I held that the CEP's granting of excess expenditure matching funds was unconstitutional.  *See Green Party*, 648 F. Supp. 2d at 373 (holding that "trigger" provision of Conn. Gen. Stat. § 9-713 "place[s] a substantial burden on the exercise of First Amendment rights and the state has failed to advance a compelling state interest that would otherwise justify that burden").  That holding was recently affirmed by the Court of Appeals.  *See Green Party of Conn. v. Garfield*, No. 09-3760-cv(L), ___ F.3d ___, slip op. at 49 (2d Cir. July 13, 2010) (concluding that the excess expenditure provision violates the First Amendment).  Furthermore, the Second Circuit vacated the permanent injunction I entered against the enforcement and operation of the CEP and ordered that a new injunction be entered

consistent with its opinion.[2]  *Id.* at 55.  That new injunction will undoubtedly prohibit the payment of excess expenditure matching funds, which the Second Circuit concluded to be unconstitutional.  *Id.* at 49.  But that new injunction has not yet been entered.  Nor can I, in the context of the *Green Party* case, enjoin the enforcement and operation of Conn. Gen. Stat. § 9-713 and the excess expenditure matching funds it establishes because I have not received the mandate from the Court of Appeals.  *See United States v. Rodgers*, 101 F.3d 247, 251 (2d Cir. 1996) ("A district court does not regain jurisdiction until the issuance of the mandate by the clerk of the court of appeals.").  Thus, the court finds itself in limbo: the state's excess expenditure matching funds have been found to be unconstitutional, but, for the time being, the state may continue distributing excess expenditure matching funds under the CEP.

## II.    Standard of Review

"[I]nterim injunctive relief is an extraordinary and drastic remedy which should not be routinely granted."  *Buffalo Forge Co. v. Ampco-Pittsburgh Corp.*, 638 F.2d 568, 569 (2d Cir. 1981) (internal quotation omitted).  "The Second Circuit has never applied a different standard for a temporary restraining order than for a preliminary injunction, and district courts have assumed them to be the same."  *Allied Office Supplies, Inc. v. Lewandowski*, 261 F. Supp. 2d 107, 108 n.2 (D. Conn. 2005).  That standard requires the plaintiffs to demonstrate "'a threat of irreparable injury and either (1) a probability of success on the merits or (2) sufficiently serious questions going to the merits of the claims to make them a fair ground of litigation, and a balance

---

[2] Although I enjoined the operation and enforcement of the CEP, *see Green Party*, 648 F. Supp. 2d at 374, I stayed the injunction pending the outcome of the appeal.  *See* Order Granting Motion to Stay, No. 3:06cv1030 (SRU), Docket Entry No. 399 (D. Conn. Sept. 29, 2009); Order Granting Motion for Extension of Time and Motion to Stay, No. 3:06cv1030 (SRU), Docket Entry No. 395 (D. Conn. Sept. 14, 2009).

of hardships tipping decidedly in favor of the moving party.'" *Id.* at 108 (quoting *Motorola Credit Corp. v. Uzan*, 322 F.3d 130, 135 (2d Cir. 2003)).  Furthermore, "when, as here, the moving party seeks a preliminary injunction that will affect government action taken in the public interest pursuant to a statutory or regulatory scheme, the injunction should be granted only if the moving party meets the more rigorous likelihood-of-success standard." *Sussman v. Crawford*, 488 F.3d 136, 140 (2d Cir. 2007) (quotation omitted).

Even if the plaintiffs demonstrate irreparable harm and a likelihood of success on the merits, however, the remedy of preliminary injunctive relief may still be withheld if equity so requires.  "An award of an injunction is not something a plaintiff is entitled to as a matter of right, but rather it is an equitable remedy issued by a trial court, within the broad bounds of its discretion, after it weighs the potential benefits and harm to be incurred by the parties from the granting or denying of such relief." *Ticor Title Ins. Co. v. Cohen*, 173 F.3d 63, 68 (2d Cir. 1999). In cases concerning a state's electoral process, courts must, as a matter of equity, consider whether the public interest favors the issuance of an injunction that threatens to interfere with or interrupt an ongoing election. *Diaz v. Silver*, 932 F. Supp. 462 (E.D.N.Y 1996) (three-judge panel); *see, e.g.*, *McComish v. Brewer*, No. cv-08-1550-PHX-ROS, 2008 WL 4629337, at *12 (D. Ariz. 2008) (holding that, in challenge to state's campaign finance system during the "extraordinary context of an election in progress," preliminary injunctive relief was not warranted because the harm to participating candidates and the public outweighed the plaintiffs' irreparable harm and likelihood of success on the merits).

**III.    Discussion**

The plaintiffs have moved for a temporary restraining order and preliminary injunction against two sets of defendants.  First, the plaintiffs seek to prevent the SEEC, Lenge, Wyman, and Nappier from distributing any future excess expenditure matching funds to the Fedele and Boughton campaigns.  I refer to those defendants as the "state" defendants.  The second group of defendants that the plaintiffs seek to enjoin are the Fedele 2010 Joint Gubernatorial Campaign Committee, Fedele 2010, and Boughton for CT 2010 campaign committees, the recipients of the excess expenditure matching funds, and John Doe Corp., one or more private corporations that will provide services to the campaign committees in exchange for those funds.  I refer to that second group of defendants as the "committee" defendants.  I address the plaintiffs' motion with respect to each set of defendants separately.

      A.    <u>The state defendants</u>

There is no question that the plaintiffs have demonstrated probable success on the merits.  The Second Circuit has held that Conn. Gen. Stat. § 7-913 is unconstitutional and that the CEP's distribution of excess expenditure matching funds to participating candidates violates the First Amendment.  *Green Party*, slip op. at 49.  Therefore, there is no doubt that the plaintiffs will succeed on the merits of their claim that the state and its agents may not grant Fedele matching funds.

Where this motion is contested, and where it will ultimately be decided, is whether the plaintiffs have proven that they will be irreparably harmed absent injunctive relief and whether the public interest favors enjoining the distribution of excess expenditure matching funds to Fedele.  The plaintiffs claim that they will be irreparably harmed in at least two ways.  First, they

contend that the CEP's grant of matching funds burdens their First Amendment rights because they are being penalized for engaging in political speech – that is, for spending more money on Foley's campaign. That is the same constitutional harm the plaintiff posited, and the Supreme Court accepted, in *Davis v. Federal Election Commission*, 128 S. Ct. 2759, 2771-72 (2008), and which the Second Circuit identified in striking down Connecticut's excess expenditure matching funds in its *Green Party* decision, *see* slip op. at 47-48. The plaintiffs also argue that they will be harmed because granting matching funds to Fedele will force Foley to spend more on his campaign than he would have wanted. In essence, Foley's campaign strategy is not to spend money merely to communicate with voters, but to outspend his rivals and, thus, communicate more visibly and loudly than them. The matching funds make that a more expensive proposition. In order to outspend Fedele, Foley must expend more than $2.5 million, the sum of Fedele's initial and maximum matching grants, rather than half that amount, which would represent the value of the initial grant by itself. The matching funds therefore raise the cost of executing Foley's campaign strategy, and, so the plaintiffs maintain, thereby inflicts irreparable injury. I assume that second proposed harm is one for which injunctive relief may be appropriate, to the extent it restates the harm identified by the *Davis* Court: that, under the CEP, "the vigorous exercise of the right to use personal funds to finance campaign speech produces fundraising advantages for opponents in the competitive context of electoral politics." 128 S. Ct. at 2772.

The existence and nature of an injury is only one factor to consider when determining whether the harm is irreparable, however. Another factor is the parties' delay in commencing their suit. "A long delay by plaintiff after learning of the threatened harm may be taken as an indication that the harm would not be serious enough to justify a preliminary injunction."

Charles Alan Wright et al., 11A Federal Practice and Procedure § 2948.1, at 156 (2d ed. 1995); *see also Citibank, N.A. v. Citytrust*, 756 F.2d 273, 276 (2d Cir. 1985) ("Preliminary injunctions are generally granted under the theory that there is an urgent need for speedy action to protect the plaintiffs' rights. Delay in seeking enforcement of those rights, however, tends to indicate at least a reduced need for such drastic, speedy action."). The plaintiffs were dilatory in filing his lawsuit. Foley officially registered as a gubernatorial candidate in December 2009, more than seven months ago. In the time since he declared his candidacy, Foley has been, or should have been, aware that Fedele was conducting his campaign with an eye towards qualifying for public financing under the CEP. Furthermore, at the time Foley declared his candidacy, Connecticut's campaign finance system had been enjoined by this court but was operating pursuant to a stay, and Foley either was, or should have been, aware of that development. The plaintiffs therefore had ample opportunity to move to intervene in that case or file a separate lawsuit to enforce my ruling voiding the excess expenditure matching funds against Fedele.

Even assuming that they were waiting to initiate his suit until Foley's campaign triggered the excess expenditure matching funds, the plaintiffs knew that Fedele would be entitled to those matching funds by, at the latest, April 1, 2010. In his first SEEC expenditure report, dated April 12, 2010, Foley reported raising approximately $2.4 million by March 31, 2010, more than six weeks before the Republican Party nominating convention that marks the beginning of the primary season. Ex. C to Def. Fedele 2010 Reply (doc. # 13), at 2. Under the CEP, those campaign receipts would clearly have triggered excess expenditure matching funds for Fedele's primary campaign, and the plaintiffs could have moved to intervene in the *Green Party* case or filed an independent suit at that point. The plaintiffs could even have filed this lawsuit on July 1,

2010, when the Fedele and Boughton campaigns announced their intentions to form a joint committee to qualify for CEP funding, or sometime before July 8, when the SEEC determined Fedele qualified to receive CEP funding and granted his campaign $937,500 in matching funds. Instead, the plaintiffs stalled, just long enough for the Second Circuit to issue its ruling affirming that the excess expenditure matching funds are unconstitutional.  Now, in the eleventh hour, they ask for an immediate injunction to bar the state from granting any more matching funds to Fedele and to prevent the Fedele campaigns from spending the matching funds they have been granted.

That delay in commencing suit is troubling.  Although I acknowledge that failing to issue an injunction now may deprive the plaintiffs of a remedy – the SEEC may grant the final installment of matching funds to Fedele as soon as today – the plaintiffs' decision to wait until the last minute, and until after close to $1 million in matching funds has already been granted, to sue the state defendants undermines the alleged seriousness of the harm that the plaintiffs stand to suffer.  It also undermines the conclusion that the plaintiffs will be irreparably injured without an injunction; had equitable relief been truly necessary, the plaintiffs would have brought this lawsuit at any of the earlier dates listed above.  For those reasons, the plaintiffs have not proved irreparable harm and are not entitled to a temporary restraining order.

Even assuming that the plaintiffs have demonstrated irreparable injury, moreover, they are not entitled to a temporary restraining order because the public interest weighs strongly against it.  At the outset, it must be emphasized that a court should be careful when intervening in a state's electoral process.  *See Reynolds v. Sims*, 377 U.S. 533, 585 (1964) ("With respect to the timing of relief, a court can reasonably endeavor to avoid a disruption of the election process which might result from requiring precipitate changes that could make unreasonable or

embarrassing demands on a State in adjusting to the requirements of the court's decree."). Here, entering an injunction to prevent Fedele from receiving the full amount of the excess expenditure campaign funds harms Fedele and, by extension, voters. Fedele opted into the CEP expecting that, by adhering to the law's limits on fundraising and expenditures, he would be entitled to receive financing from the CEP. Fedele elected not to raise more than the qualifying amount of funds on that expectation; moreover, he will be unable to raise private campaign contributions now, because of both his CEP participation and the limited amount of time between today and the August 10th primary.

An injunction would therefore harm Fedele greatly. As the Connecticut Superior Court noted in denying Foley's motion for a temporary restraining order: "A balancing of the equities also favors the defendants. Since the Fedele and Boughton campaigns have elected to participate in the CEP, they cannot raise any private funds now. Granting the injunction would, therefore, cause great harm to those defendants." Ex. A to Def. Fedele 2010 Reply (doc. # 13), at 9. Although it is true that the CEP was subject to a stayed injunction when Fedele announced his candidacy and plotted his campaign strategy, he was justified in relying on receiving the campaign funds during the pendency of the *Green Party* appeal, a pendency which continues until the Court of Appeals issues its mandate. *Cf. McComish*, 2008 WL 2469337, at *10 (holding that balance of equities favored denying the motion for a preliminary injunction because an injunction "would disrupt the justifiable expectations of participating candidates" and it would be unrealistic "to expect that participating candidates would have the networks and resources available to develop and implement an effective fundraising strategy" close to the date of the election).

Enjoining the state defendants from granting matching funds harms not only Fedele, however. It also is injurious to the public interest insofar as it deprives voters of the opportunity to hear the viewpoints of a gubernatorial candidate who reasonably opted into the CEP trusting that he would be able to receive and expend funds in accordance with its rules. Issuing a temporary restraining order will render voters in the Republican primary less informed about the gubernatorial candidates seeking the Party's nomination because it will limit the speech of one candidate who followed and relied on the campaign finance rules as they existed. Furthermore, the facts in this case indicate that the plaintiffs will not be significantly hamstrung by Fedele's increased spending from the excess expenditure matching funds. Foley has raised more than $2.7 million, a total amount that exceeds what Fedele will be granted by the CEP; in other words, Foley will still be able to outspend and out-campaign Fedele, although perhaps not to the degree that he would prefer. On balance, limiting voters' access to candidates and their messages does a greater disservice to the public than permitting both candidates to campaign to the fullest extent. The public interest is best furthered by denying the plaintiffs' motion.

Next, denying the plaintiffs' motion will ensure a more orderly administration of the CEP. Once the Court of Appeals issues its mandate in *Green Party*, this court will be bound to enter a new injunction barring the CEP from granting matching funds to any candidate. That will be a single injunction affecting all candidates running for state office in the 2010 election. Issuing an injunction for Foley individually upsets the orderliness of that process. Furthermore, it invites other nonparticipating candidates to race to the courthouse in order to seek preliminary injunctions denying their participating opponents the right to receive CEP matching funds. The public interest is best served by having one permanent injunction that applies uniformly to all

candidates, and not a hodgepodge of individual preliminary injunctions for every nonparticipating candidate threatened by the prospect of triggering matching funds for his rival.

Finally, I note that issuing an injunction in this case would likely affect the timing for the legislature to amend the CEP and keep it operational during the 2010 election season. In the *Green Party* litigation, the Second Circuit remanded for this court to determine the meaning and effect of Conn. Gen. Stat. § 9-717, which governs the severability of the Campaign Finance Reform Act ("CFRA"), of which the CEP is a part. That law appears to create a 30-day window for the Connecticut legislature to amend the CFRA in response to an injunction of any part of the CEP. *See* Conn. Gen. Stat. § 9-717(b). The meaning of section 9-717, however, is "far from clear," *Green Party*, slip op. at 53, and I have not yet decided its effect on the CFRA or on the legislature's responsibilities, *see Green Party*, No. 3:06cv1030, Docket Entry No. 403 (July 14, 2010) (setting schedule for parties to brief the issue). Enjoining the excess expenditure matching funds now, before the import of section 9-717 has been decided in *Green Party*, threatens to introduce more confusion for the legislature and candidates at a particularly pitched moment in the election cycle. Denying the injunction avoids this added complication.

Because the plaintiffs have not proved an irreparable harm or that the public interest favors them, their motion for a temporary restraining order against the state defendants is denied.

### B.     The committee defendants

The plaintiffs have similarly failed to prove irreparable injury or that the public interest favors them with respect to their motion to enjoin the committee defendants from spending matching funds they have received or stand to receive in the future. I also deny their motion for a temporary restraining order because the plaintiffs have not proved a likelihood of success on the

merits.

The plaintiffs have cited no support for the proposition that private individuals and organizations can violate the First Amendment by spending state grants wrongfully given them. State action is necessary to a First Amendment cause of action. *Cooper v. U.S. Postal Serv.*, 577 F.3d 479, 491 (2d Cir. 2009). "Actions of a private entity are attributable to the State if 'there is a sufficiently close nexus between the State and the challenged action of the . . . entity so that the action of the latter may be fairly treated as that of the State itself.'" *United States v. Stein*, 541 F.3d 130, 146 (quoting *Jackson v. Metro. Edison Co.*, 419 U.S. 345, 351 (1974)) (omission in original). To prove that a sufficiently close nexus exists between the committee defendants and Connecticut, the plaintiffs would have to prove one or more of the following: "the state exercises coercive power, is entwined in the management or control of the private actor, or provides the private actor with significant encouragement, either overt or covert, or . . . the private actor operates as a willful participant in joint activity with the State or its agents, is controlled by an agency of the State, has been delegated a public function by the state, or is entwined with governmental policies." *Id.* On the face of the plaintiffs' complaint and submissions to the court, I do not see allegations of such a nexus. The committee defendants are completely independent of the state; they merely receive state financing for their campaigns or, in the case of John Doe Corp., are paid by an intermediary whom the state originally funded. I am highly skeptical that acceptance of CEP funds morphs the committee defendants into state actors against whom a First Amendment challenge is actionable. The plaintiffs have not established a likelihood of success on the merits, and preliminary injunctive relief is not warranted.

Besides that shortcoming on the merits, it is uncontested that the Fedele campaign has

already spent much of the matching funds it received.  Any injunction to prevent the spending of those funds would therefore be moot.

## IV.     Conclusion

Thomas C. Foley and Foley for Governor, Inc. have failed to establish that the state defendants will cause them irreparable harm and that a temporary restraining order will further the public interest.  The plaintiffs have also failed to make those same demonstrations with respect to the committee defendants, and also have not shown that they are likely to succeed on the merits.  The plaintiffs are therefore not entitled to a temporary restraining order enjoining the state defendants from granting excess expenditure matching funds to the Fedele and Boughton campaign committees, or enjoining the committee defendants from spending those matching funds.

The plaintiffs' motion (doc. # 4) is DENIED.

It is so ordered.

Dated at Bridgeport, Connecticut, this 16th day of July 2010.

/s/
Stefan R. Underhill
United States District Judge